Good morning and may it please the court. In a qualified immunity case, if judges could disagree and we do not expect, we do not require officers to guess at the correct results leaving them to hope they pick the winning side to avoid liability. Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Now this court is well versed of course in the inquiry, the two-prong inquiry into qualified immunity. We've had one case on qualified immunity already this morning and the two the two prongs are essentially there must be a violation of a constitutional right and that constitutional right must be clearly established. I'll address each of those in turn. The first step in the section 1983 case or the qualified immunity analysis is to identify the constitutional right that is allegedly violated. In this case ZJ has alleged the violation of her Fourth Amendment right specifically basing it on an unreasonable search through the use of excessive force. And just to step back a bit, there are two sets of officers here. There are homicide detectives and there are tactical team officers. There are actually 10 officers being sued. It's important to note under section 1983 that each individual is only responsible for his or her own misconduct. They're not liable for the alleged misconduct of others. On appeal have you separated out that liability by individual officer? We addressed each officer and the facts that could have supported. For instance there's only one allegation against Ray. The allegation was that she participated in a drive-by of the house. Other than that she is simply a detective that investigated the case. And to briefly discuss the facts of the case to the extent that they matter for the Fourth Amendment analysis and the qualified immunity analysis. On October 29th 2010 Nina Whitney was brutally murdered. She was stabbed at least 22 times. She was strangled and there was evidence that she was sexually assaulted. The three homicide detectives here were assigned to investigate that murder. And what they learned was that the victim's cell phone was missing and so they went about tracing this cell phone. They found that it had made a couple phone calls. One to 11812 Bristol another to a family They traced it using GPS. It hit an area an 80 meter radius around 118th and Winchester in Kansas City which includes that Bristol that Bristol Street as well. And they also traced it to an area that has businesses including a Popeye's chicken. You say they traced it you're talking about the initial tracing when they located it at after they heard it ringing? That is that is when they traced it to the 80 meter radius at 118th and Winchester yes. Okay so you're not suggesting is the Popeye's is not within that? It is not. They traced it separately to this Popeye's chicken or to an area that included this Popeye's chicken. They didn't pinpoint it down to the Popeye's chicken. They traced to this area. They called the phone and it was really they had somebody answer it. It was in a commercial chicken or a commercial kitchen. All of this they used to determine because Lee Charles checked out the address the 11812 Bristol address that the phone had called. He was employed at the Family Dollar Store that the phone had called. And his employer the Family Dollar Store had 11812 Bristol as his address. And then he worked at a Popeye's chicken as well which was in this footprint where the phone had been traced. Now before that yes it had been traced to this 118th and Winchester where the officers responded to that area when they initially tracked it and they called it and they believe they heard a phone ringing in one of two apartment buildings. Is that what triggered that tracing? They had traced it to that area. That's how they ended up in that area searching for the phone is they use the GPS of the phone to to get to that area. And when they responded to that area they tried calling a phone and that's when it went off. So based on all of this they concluded that it was reasonably likely that Lee Charles was in possession of the cell phone. So they applied for a search warrant and a pickup. And admittedly they didn't include in the search warrant application that they had also heard the phone ringing at the in one of two apartment buildings at 118th and Winchester. And I would submit to the court that's just simply immaterial. And all of these locations that are in the search warrant are connecting the phone to Lee Charles. At that point they get a search warrant for the place that Lee Charles is most likely to have that evidence. His residence. But the phone call was to Bristol not from Bristol and the other place where you actually had where the phone was located was not Bristol but Winchester. So you know if you had added that information in a location where a phone is ringing and no one answers presumably and it's one o'clock in the morning that sort of would give the magistrate information that that may be where it's located and it was calling out to someplace else. And I think that that is perhaps information that could have suggested that the phone at one point was located. Of course we know that the phone is inherently a mobile. If you'd have called my cell phone over the course of the last three days at one o'clock in the morning you could have or if you trace the GPS you have found it in the Quad Cities in Iowa. One of three residences there. If you did trace it during the day yesterday you'd have found it in Cedar Rapids, Iowa. If you traced it today you'd actually find it in my office. I didn't bring it with me but cell phones are inherently mobile. So the fact that it was in one location at one o'clock in the morning doesn't necessarily rule out probable cause for another location. Now what it may do is provide probable cause for a second location but it doesn't inherently defeat probable cause in the most likely location that it would be which is his residence. And again that's the residence that the computer check showed. It's also the residence that his was residing. And so including that in the affidavit would have simply and I would I would submit to the court including in the affidavit wouldn't have provided probable cause for the 118th and Winchester address either. Or at least I would not want to be defending that warrant. It's an apartment building that had multiple units in it and I don't think that the officers could pinpoint it down. They couldn't pinpoint it down to one building let alone a distinct unit. Having got the search warrant and picking up they pick up Lee Charles fairly fairly quickly but what they don't know is whether there are other accomplices anybody helping him. And so they... Is there any evidence in the record that there were accomplices? The no there was no evidence one way or the other and that's because this search occurred on November 3rd 2010. Like I said the 29th and this was very early on in the investigation. They didn't really have any other leads. Essentially what they had was this cell phone and that's the cell phone obviously they had tracked to Lee Charles but they had not they didn't know whether there were other other accomplices or not. They had a particularly heinous murder that they wouldn't rule out that it could have been done by multiple people. And so they they go to the address that they have for his residence search and because it's a homicide and because it's a particularly heinous one they they enlist the TAC team to execute the search warrant which essentially means the TAC team enters the residence they cleared to make sure... Was that decision based on the circumstances or is it that fact a policy to use these teams under most circumstances? It's a policy to use it's a policy for KCPD to use either uniformed personnel or a tactical response. Now the homicide detectives because of the type of crimes that they are dealing with generally use tactical response. I suspect that if you ask the property crimes detectives who are dealing with burglaries and other things they probably use uniformed personnel more than they would use tactical response. But the homicide detectives that based on the crimes that they're dealing with they typically would use a tactical response team. And that's that's what they did here. They put the policy, they got a tactical response team and they executed the search warrant that evening. The tactical response team approached the residence and after a lengthy delay they start to breach the door. Now when they start to breach this outer door the inner door opens and the individual opens it steps back. At that point they believe that they're compromised. They breach the door, they throw in a flashbang and they enter they clear the residence, turn it over to the detectives to do their search. Counselor if they were worried about being compromised why did they knock and announce? Because that's what the law requires. Just because they knock and announce doesn't mean that they're not going to, that they want individuals to see them and have a chance after they've been seen and the individuals know that they're inside to prevent them from entering. Here though there was evidence that someone came to the I'm getting the door something I've got keys so why you've presented a set of facts but maybe not the ones in the light most favorable to the plaintiff here. What the officers knew and what the one officer said was he saw the keys in her hand and she may have said keys. Nothing beyond that. It doesn't suggest one way or the other that she was going to open the door. What's undisputed is once she opened that inner door she took a few steps back and at that point the officers both have concern for their safety and they also have this additional concern about destruction of evidence. They don't know what's going on inside. What they know is they've been outside the door locked out for at least for them a considerable amount of time, several seconds enough for the knock and announce requirement and then for her to get to the door and not open it. How do you factor in the lack of investigation to determine whether that approach was right? You said it's a homicide investigation which I think is undisputed but you've got Mr. Charles in custody for three hours and I understand it's undisputed he was not interviewed, correct? Before the tactical team went to the house? It's not in the record whether he was interviewed or not. He is interviewed at some point but I'm not sure that it's in the record but what yeah and so I guess I'm at what I'm asking is is how do we factor in then the lack of some of the investigation so if there's nothing in the record about interviewing someone who's in custody there's nothing I think in the record that they did any kind of additional investigation as to who lived at the house what the layout of the home was isn't that aren't those facts that have to be viewed as well? Sure and what they do is they do a drive-by of residents to ensure that they have the correct one to see to see what it looks like now they they don't they've done they've picked up somebody on this warrant so really for them times of the essence when they are looking to recover evidence so that it can't be those three out it was three hours right before they right and I mean I think what the suggestion is that they should have waited even longer and really that that time is for them to get the tactical team together to to brief it to do the drive-by and then and then to execute so can hopefully find evidence that that connects Lee Charles to the murder of Nina Whitney or at least to the cell phone you know and so to briefly discuss our or to discuss maybe briefly the second point is whether it's clearly established I want to note that the the Supreme Court's made clear that you can't look at this at a high level of morality and so the Supreme Court neither the Supreme Court or this court has ever found the use of a flashback the district court relied on to seventh-circuit cases there's also there's a 2013 a Southern District of New York judge said basically that the clear there's no clarity in this specifically citing to the 8th Circuit who had the thing that the 8th Circuit had declined to find if the judges if judges can disagree and we don't hold the officers I see him in my Republic very well mr. Walden may it please the court my name is Michael Waldeck and I'm the attorney representing CJ who is a minor two and a half years old at the time that this event occurred CJ is CJ the is CJ the only plaintiff yes yes she is that's the only plaintiff I rep and that was the only action I think that was their parents home that she was staying in it and she was in the basement right well no she had gone up to start up the steps to go up to the tri-level house to the point where the flash bomb landed and that's where she was exposed to it I'd like to start by just saying this and I won't dwell on it but this event changed that girl's life she was two and a half years old and now she's fighting post-traumatic stress and other injuries and I emphasize this because these flash bombs that are being used we talk about it kind of Cavalier like it's a fire cracker on the fourth but these flash flash bangs that we're talking about are so powerful that they can melt steel molten steel they are so powerful that they can destroy hearing sight or the ability to reason as a result of this and they also can cause deaths those are all facts in this case that we know those are all the facts about the impact of this flash bang grenade in the record and undisputed yes it is it's in the record and it's in it so that you can find it quickly your honor it's part of the experts testimony with regard to how there's a munitions person to we hired who was an expert talk about how strong it was and what about was there testimony to about the effect of one of these grenades in various size locations in other words a smaller living room would have more impact than a larger warehouse or was there any connection between I guess what I'm trying to say is the nature of this particular house and the damage that something like this could do well we know there was a fire inside the house we know that she was in the middle of there wasn't anything specifically about that and all these are these grenades and forgive my ignorance on this do they come in in different power levels or strengths or is there one power the ones that the SWAT team uses and out Nick can talk further to that but I understand there's two levels of it but basically the ones that we used in our house are the bigger of the two all right now just quickly to make sure that we don't miss this the phone was never at the Bristol house well while we're was never close excuse me excuse me yes I'm sorry while we're talking about the flashbang since we brought that up right away yes what makes it clearly established that off that it's unconstitutional to use a flashbang grenade during the execution of a search warrant in a murder case okay it that isn't established that isn't established what is this I'm sorry is or is not it is not okay yes but what is established that if it's used under certain circumstances without knowing what the situation is then that's what that's where the harm comes and that's what we're claiming in other words if the home is sacred and we know we protect people who are in a home if they're going to be exposed to these under what circumstances is it and how do we use it what are the facts in this case and it was touched on earlier in the argument they had arrested Lee Charles he was in capacity in custody for three and a half hours before this raid ever took place no interrogation was ever made of him about what the situation was or what any of the salient facts were done they went ahead under cover of darkness at seven o'clock after a briefing meeting and went ahead with the invasion of the home when they knew that the phone they were concerned about was not in that home Lee Charles was not in that home and that phone was never anywhere near Bristol and we'll get into the warrant later but that's that's the fact with regard to the situation so when let's just put ourselves in this situation you're the SWAT team and you're on the stupid in front of this house and you're trying to decide whether she you should go further we know from the cases that one of the criteria that we're talking about here is to say okay under the circumstances is this necessary because there's somebody that's dangerous in there that may harm people a criminal or whatever it is is this a situation where if they go in they're likely to incur resistance by them or that people will like be involved in flight and if I have a risk to these people these men that are heavily armed well in this case as we establish for the facts we know from the facts that Lee Charles who was the murder suspect the fella that they thought did this he was already captured the phone that they weren't sure that they were looking for wasn't at Bristol the house they were then going to evade with this very dangerous bomb that they're going to throw in there they didn't there's no doubt about that there's no dispute about that fact and then in addition to that what do we know about the actual situation and what we know about the actual situation is they're on the front stoop and when they come up there to with the lead man there of the seven men that are going to go in there and they look and see at that time Carla Brown a diminutive young young lady who was the babysitter she hears the noise and comes towards the front door there's two doors if I can describe them for you the two doors are this if I'm standing inside like Carla was okay I've got one solid wooden door she got that door open so that they could come in and then step back to see what she was dealing with and saw that they were going to come further through the outer door which I call a storm door to glass door that you can see through she could see through that they were coming on so so what she did with those keys I don't think any bailed out she's jingling those keys like this and what did that convey to anybody with a reasonable analysis of it I've got the keys I'll unlock the door so they didn't even have to go in because Carla was going to let them in but they and you don't have to rely on me on this or any of my clients mr. Jorgensen one of the policemen that was on the SWAT team said I saw her jingle the keys position he said I saw her jingle the keys does the storm door have a key lock on it yeah well be open from the inside with a key it's a double lock and it's kind of it locks it can be locked from the inside or the outside with a key from both sides when yeah one key from both of and their neighbors have the same thing too which I'd never seen yeah I'd never seen that either that's why I asked but in any event she had the key that would grab them entry without anything without any resistance pardon me okay so what did they know further about what the situation was well that's the great frustration that we have as plaintiffs counsel in the plaintiffs because there was no surveillance there was no investigation to determine whether anybody was in that house whether they were going to get hurt what was going to happen or whether there were criminals and they should march on and we have in this situation we have the officers dodging this issue by saying well we really weren't sure what they were or not okay if you would just think for a second about that the neighbors next door are 50 feet away an officer could have walked there inconspicuously and asked them and they would have found out who did live in that house and who did live in that house as the evidence will show an 84 year old grandmother who was so arthritic that they tried to put cuffs on her after this and couldn't get her arms back there a 68 year old aunt who was taking care of her then Carla Brown who was a babysitter and my client ZJ okay that's who was in the house so if they had done some work in advance they would have known that those are the people there and they wouldn't have under any circumstances thrown that bomb in that room and they would not have taken any action to do anything but ask them what's going on the parents arrive another thing is that's troubling about this just coming home the Jones's from work less than an hour after they had raided this place as they ordinarily did this Jones got out and she talked to the officers and they said well what about Lee Charles she said well he hasn't lived here for the last year they're relying on two outdated directories of where he lives to establish that he was in the house the fact is he hadn't been in the house in a year I thought an employer also told them that he lived at that it pardon your I didn't hear you I thought one of his employers also told the police that he lived at that address what the employer said at the Dollar General I believe it was your honor was that young way at the time that he applied that's what he gave her and they had an address which would have been somewhat remote from the time that we're talking about okay so that's where they are before they haven't thrown the bomb yet but but they know he's in custody they've got the phone it's nowhere near Bristol where they are Bristol is a block and a half from Winchester and they go ahead and they say well they're gonna force their way in they see the jingling keys like that at that point they don't have somebody who's threatening in fact of the situation it's the opposite of that they have somebody who's trying to cooperate with them to let them in so that they don't tear down the door okay they didn't hesitate they took a head with a hooligan blow through there and in the officers went through the house saw there wasn't anything of interest they left oh when the officers came through how quickly did the grenade get tossed was it immediate it's pretty I don't know exactly but let me describe what happened and we can kind of get our arms around it he the lead man that had the bomb okay he steps forward so he's going to be stepping forward like I am and at that time Carla Brown has stepped back because she didn't get any response to jingling the keys and he threw the bomb over her head and it landed in the middle of the living room 15 seconds 20 seconds something like that seems like me it might be reasonable for that and during that time why that's when the concussion occurred that damaged JC and cost of her problems that she's going to have the rest of her life now what you want to say I would hope is why in the world did you proceed with this when you had no threat of anybody in there it was going to cause any problems and the proof of the pudding was that in fact they tried to in there without tearing up the place is there any evidence in the record why the officers didn't interview mr. Charles before the tactical team went the only thing I can figure is I it's one of the great hidden secrets because I think that would be one of the first people if you'd want to talk to so there's just nothing there he's a suspect and they've got him right there what's the story what did you do so forth and so on nobody interviewed him they had a was in custody what the situation was with regard to the phone and the rest of it they'd had the phone location for four days before that so that's all the information they had now when we look at these cases that I've seen what what guard what what exactly is the evidence about when he was arrested because it would be typical no it's 337 in the afternoon it would be typical to Miranda is him immediately and and and normally to tried is there any evidence that he refused to talk to him or that they even tried here's what we know is that he was cooperative with them and that that's in one of the testimony but I don't know all I know is that sergeant Eckert who was in charge of the case for the police department that she had signed the application to arrest him and I know that was done and he was taken to custody not in the central city but at another location of the Kansas City Police Department but what happened after that there's nothing in the right so none of the arresting officers were posed on that question no no what we well no we have information that nobody had had interrogated him I'm sorry I wasn't I guess nobody even attempted to interrogate there wasn't it yeah yes I mean again it would be sort of standard practice to get take down some pedigree information yeah was is there any evidence about that one way or the other as to that part no there was okay I know I'm short of my time so let me get quickly just to the points that I just think are important to make that that bomb is terribly dangerous it's thrown in a situation where we have the right to believe that somebody in their home has a protection and the reason that this happened was because nobody went to the trouble to do some surveillance beforehand just basic stuff like I did when I was starting my practice in law we're gonna get we're gonna get something out we go find out where the people are that we want to make the complaint to or file a petition and that's done in a neighborhood in this neighborhood it's a nice nice setup it really is so there isn't any problem or any threat for them to go in to do that what the cases say is and the two-prong argument has talked a lot about it the one problem is is there excessive force in the case that's from this court in which you decided in Rekhosek versus prisoner and knocking out two of his teeth was excessive force how does that stack up with a little girl that's got the problems that she has and she's gonna have them for the rest of her life for a smoke bomb or a bomb that never should have been thrown and we're talking about excessive force then you get to the second prong which is whether or not under the circumstances what a reasonable officer would have done a reasonable officer would have had some information before they went further they would have taken the trouble to follow through with the jingled key before they did that and they would have obviously realized there was no threat at all were those three ladies gonna attack them in some ways those big guys with all that stuff on I mean it's not it's not crystal clear that number one they would have discovered exactly who was in the house there could have been other people in the house and in addition to the three people that were affiliated with the murder right that there's no way they could possibly know that even if they did canvass and that's that's exactly what we're saying you don't go forward with something this dangerous without having some idea what it is and there's no problem to find that out they could have found it out from the Joneses if they'd waited 55 minutes or they could have walked next door to the neighbor and said who lives in Judge Blender's house okay well if this this and this and they would have known that then they could have gone from there and that's the trouble with using these and in a case in the future a situation in the future when they go up and they're confronted with these things we hope that you're finding in this case would say to them be careful do your work out like good policemen do and you'll save a lot of people a lot of problems thank you gentlemen I appreciate it I offer you miss Henderson how much time for rebuttal council has 59 seconds fire I will be brief reasonableness is judged from the perspective of a reasonable officer on the scene rather than with the 2020 vision of hindsight saying that these people weren't dangerous all of that is hindsight saying that they would have opened the door is hindsight and I want to also just briefly know the cases he was citing talking about this courts excessive force cases are seizure cases he's not bringing a seizure he's brought a search claim and at least the Eastern District of Arkansas one judge there said in 2012 but he has brought an excessive force claim right based on an unreasonable search he's brought a violation of the Fourth Amendment based on an unreasonable sort search through excessive or else before purposes of the clearly established analysis at what point does the excessiveness of the force become obvious in they've used a tank with that could they have used a I mean there generally has to be a case at least pretty close on point that's what the Supreme Court keeps saying is that in these Fourth Amendment cases there the reasonableness is fact-specific and there has to be a case pretty close to the facts of this case to let the officers know that what they're doing is violating a constitutional right thank you thank you counsel case has been well argued and is now submitted we'll issue an opinion in due course that being our final case for argument court will stand and